IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JOHNNIE BIRCH, )
 )
 Plaintiff, ) TC-MD 120719C
 )
 v. )
 )
MULTNOMAH COUNTY ASSESSOR, )
 )
 Defendant. ) **DECISION**

Plaintiff has appealed the real market value (RMV) of a single-family residential home in Portland identified in the assessor's records as Account R273439. The tax year at issue is 2011-12. Trial in the matter was held January 29, 2013. Plaintiff represented himself and appeared and testified on his own behalf at trial. Defendant was represented by Jeff Brown (Brown) and Barry Dayton (Dayton), Registered Appraiser III, who prepared Defendant's appraisal report for this appeal. (Def's Ex A at 20.) Both Brown and Dayton are employed by Defendant. Dayton has appraised properties in rural and suburban areas of Oregon and Washington since 1991. (*Id.* at 21.) Plaintiff's exhibits 1 through 7 and Defendant's Exhibit A were admitted at trial.

## I. STATEMENT OF FACTS

The subject property is a three bedroom, two and one-half bathroom, multilevel contemporary home built in 1999, with an attached two-car garage, situated on a 5,000 square foot lot. (Def's Ex A at 5, 12.) The home has 2,757 square feet of finished living area on three levels. (*See id.* at 12-13.) The lot is steeply sloped, and due to its location and design, affords views from the rear of the home from all three levels. (*Id.* at 5.) Street-level entry to the home affords access to "public" areas of the home including the kitchen, vaulted living and dining rooms with hardwood flooring and gas fireplace located at the center, plus a half bath. (*Id.*) The

/ / /

DECISION TC-MD 120719C 1

two-car garage is accessed from that level as well. (*Id.*) The kitchen and half bath both have hardwood flooring, and the kitchen has quartz countertops. (*Id.*)

The upper level of the home has a master bedroom suite with coved ceilings, a walk-in closet, a bathroom with double vanity sinks, tile flooring and counters, a jetted bathtub, and a glass-enclosed tile shower. (*Id.*) The bedroom also has a bonus area and a sliding glass door leading to a balcony. (*Id.*) "There are three areas on this level that overlook * * * the main level's vaulted or other areas." (*Id.*)

The lower level of the home is built with quality similar to the two upper levels (as opposed to below-grade finished areas of homes often built out with less quality and craftsmanship), and features two bedrooms plus a family room and a full bathroom with tile counters and a bathtub with a shower head. (*Id.*)

Plaintiff purchased the subject property on or about July 11, 2011, (closing date) for $400,000, but, according to his testimony, agreed with the seller on the price "about three weeks earlier," which would be roughly mid-June. The seller, Chandler & Newville, Inc., purchased the home less than a year earlier, in October 2010, for $333,500. (Ptf's Ex 4.)

According to evidence submitted by Plaintiff, Chandler & Newville bought the home at an auction following a foreclosure. (*Id.*) Plaintiff testified that the seller did some maintenance and repairs to the home and then resold it. Plaintiff submitted two documents from his Broker, Terri Layton (Layton), addressing the condition of the home. One is an email dated October 26, 2012, and includes an excerpt from the listing which reads as follows: "easy living in SW Portland! Crisp, clean, stylish contemporary with sparkling interior includes newly refinished espresso stained floors & new carpet/paint." (Ptf's Ex 5 at 1.) That document also states that "updates" in addition to those listed in the MLS "included new fixtures in the dining area worth approx $1600. He also did extensive maintenance work to fix the various issues with the home."

(*Id.*)  A second email sent by Layton to Plaintiff, dated January 16, 2013, (shortly before trial), addressed "To Whom it may concern," states in pertinent part: "[t]he home had to have several upgrades and repairs done prior to it's [sic] sale to my client * * *.  I witnessed some of the final repairs being made at the time my client purchased this home.  On that date [Plaintiff's June 2011 purchase] the home was in an improved condition from the condition it was in on 10/13/2010."  (*Id.* at 2.)  Layton did not testify for Plaintiff at trial, and was therefore not available for cross examination to elaborate on the nature or extent of work done, or render an opinion on the consequent impact the work had on value.

The RMV on the assessment and tax rolls for the subject property for the 2011-12 tax year is $517,000, with $159,500 allocated to the land and $357,500 to the improvements (the home).  (Ptf's Ex 2; Def's Ex A at 3.)  The prior year's total RMV was $584,190.  (Ptf's Ex 2.) The property's tax year 2011-12 maximum assessed value (MAV) is $433,920, up three percent from the prior year's MAV.[1]  (*Id.*)  Finally, the assessed value (AV) is $433,920 because that number is the MAV, and it is less than the property's RMV.  *See generally* ORS 308.146.[2]

Plaintiff requests a reduction in the RMV to somewhere between $333,500 and $350,000. (Ptf's  Trial Test.; Ptf's Resp To Def's Req To Make More Def and Certain; Ptf's Ex 7.) Plaintiff explained at trial that the $333,500 figure comes from the prior owner's October 2010 auction purchase, and his $350,000 figure is a trended value using the two recent, known purchase prices from the October 2010 sale at $333,500 and his July 2011 purchase at $400,000. Plaintiff testified that there was about a $70,000 difference between the two purchase prices, and he divided that amount by the roughly ten month window between the two sales, to derive a

---

[1] Unless certain specified changes are made to a property, under Oregon law MAV increases three percent annually.  See discussion in body of Decision that follows.

[2] Unless noted otherwise, all references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

monthly rate of appreciation of $7,000. Plaintiff added approximately $17,000 to the October 2010 sale based on the roughly two and one-half months between that date and the January 1, 2011, assessment date. Plaintiff also complains about what he perceives as an excessive RMV, possibly going back many years which, if "corrected" for the year at issue, should, by law, result in a recalculated (reduced) AV of $333,500, because AV is the lesser of RMV and MAV, and a reduction in the RMV to $333,500 would put that value below Plaintiff's MAV, causing AV to be based on the property's RMV rather than the MAV. (Ptf's Ex 7 at 1-2.[3]) Presumably, the same result would ensue if the $350,000 figure stated at trial were used.

Defendant, in its Answer, requested that the court sustain the roll values, but at trial submitted an appraisal report that valued the property at $505,000 under the comparable sales approach. (Def's Ex A at 7-11.) That figure is $12,000 below the current RMV of $517,000. However, as Defendant noted at trial, because Plaintiff appealed directly to this court without first petitioning the Multnomah County Board of Property Tax Appeals (BOPTA), the court cannot order a change in the RMV of less than 20 percent. ORS 305.288(1) (2011).[4] A reduction to $505,000 would equate to 2.32 percent.

## II. ANALYSIS

A.    *Value laws and regulations and burden of proof*

The main issue in this case is the RMV of Plaintiff's home as of January 1, 2011, because that is the assessment date for the 2011-12 tax year. ORS 308.007; ORS 308.210. Oregon law defines RMV for property assessment and taxation purposes as "the amount in cash that could

---

[3] Plaintiff refers to the statutory mandate found in ORS 308.146(2), that AV be the lesser of a property's RMV or MAV.

[4] ORS 305.288(1)(b) provides the court with limited authority to change the value of a property provided the property is residential in nature, no more than four units (i.e., a single-family dwelling up to a fourplex, including condominiums including homes), and, as is important for this case, the court determines "that the difference between the real market value of the property for the tax year and the real market value on the assessment and tax roll for the tax year is equal to or greater than 20 percent."

reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).

While there are three recognized methods for valuing property, the sales comparison approach is often most appropriate for valuing residential property.[5] *Ward v. Dept. of Revenue.*, 293 Or 506, 511, 650 P2d 923 (1982) (citations omitted). This is particularly true for older properties because substantial adjustments must be made under the cost approach and if the property is not generating income the income capitalization approach is inapplicable. *Hirschfelder v. Marion County Assessor,* TC-MD 120177C, WL 5267435 at *2 (Oct. 25, 2012). Additionally, the sale of the subject property can provide a useful indication of the value of the property. *Kem v. Dept. of Rev.*, (*Kem*) 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted) (ruling that a recent sale of the property in question can be persuasive although not conclusive of a property's value).

The value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). The court looks at arm's-length sales transactions of similar property to determine a correct RMV for the subject property. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).

By statute, Plaintiff has the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. The court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing

_____

[5] An administrative rule promulgated by the Oregon Department of Revenue instructs that the three approaches to value (sales comparison, cost, and income) be considered in determining a property's value, but recognizes that all three approaches may not be applicable in a given case. OAR 150-308.205-(A)(2). Because the subject property is owner occupied and does not generate any income, neither party used the income approach in valuing Plaintiff's property. Because land value is at issue, the typical methodology prescribed by the cost approach is not relevant.

DECISION  TC-MD 120719C                                                                 5

evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); *see also Riley Hill General Contractor, Inc. v. Tandy Corp.*, 303 Or 390, 394, 737 P2d 595 (1987) (where the Oregon Supreme Court explained that the derivation of the word "preponderance" is Latin in origin and "translates to 'outweigh, be of greater weight.' ").

"Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev*., 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev*., 16 OTR 56, 59 (2002) (citation omitted). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Lebeck v. Multnomah County Assessor*, TC-MD No 100404D, WL 534207 at *1 (Feb. 16, 2011); *see also Betz Evans Associates v. Lane County Assessor*, TC-MD 110329C, WL 4714961 at *3 (Oct. 4, 2012); *Toy Box Maxi-Storage LLC v. Jackson County Assessor*, TC-MD No 110339C, WL 1958943 at *3 (May 31, 2012). "Personal conclusions with no basis in actual market data are entitled to little or no weight." *Yarbrough v. Department of Revenue and Marion County Assessor*, TC 5075, WL 4094875 at *3 (Sept. 18, 2012), quoting *McKee v. Dept. of Rev.*, 18 OTR 58, 64 (2004).

Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

B.      *The evidence and court's evaluation*

Plaintiff relies on the two purchase prices of the subject property, but primarily on the October 2010 sale for $333,500. Plaintiff also submitted evidence and gave brief testimony about the listing history leading up to his purchase in June 2011 (the date he agreed to buy the property). Earlier in this decision the court referenced the Oregon Supreme Court's decision in

*Kem* regarding the sale of the subject property. That court stated that such a sale can be "very persuasive of market value." *Kem*, 267 Or at 114. However, the *Kem* court "emphasize[d] that a recent sale of the subject property is not necessarily *determinative* of market value and does not foreclose other methods of valuation[.]" *Id.* at 115 (emphasis added); s*ee also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether the sale was "recent" and whether it was "arm's length." *Kem*, 267 Or at 114.

In this case, the subject property sold in October 2010 for $333,500. That sale was recent because it was within several months of the January 1, 2011, assessment date for the tax year here at issue (2011-12). However, there is no indication that the sale was arm's-length. In fact, the opposite seems to be true. The purchasers involved in the October 2010 sale were Chandler & Newville, Inc. (Chandler & Newville), a company Plaintiff believes is in the business of buying homes cheaply, making some repairs, and then "flipping" them for a profit. When questioned by the court, Plaintiff testified that Chandler & Newville bought the subject property at an auction after the lender foreclosed on the previous owner who became ill and was unable to keep up with his mortgage payments. Plaintiff insists that the October 2010 auction sale was a market transaction and a good indicator of value, although he does not explain his conclusion beyond stating that the assessor only "estimate[s] [how much] the property would sell for  * * * versus the actual value the property *did* sell for when put on the open market near the assessment date." (Ptf's Ex 7 at 1) (emphasis in original). The court disagrees.

There are several problems in that argument. First, an auction sale is not an open market transaction. An open market transaction is one where the property is listed for sale to the general public, by an owner under no undue pressure to sell, who has undertaken sufficient effort to ascertain the property's worth (even if only by working with a realtor), and marketed the

property to the public for a reasonable amount of time – generally at least a few months. Also, there must be typical financing involved. An auction violates all of those requirements. Homes are generally listed for a brief period, followed by a single day sale, often on the steps of the local courthouse, and the buyer must have cash on hand and be ready and able to pay on the spot. The underlying seller is typically experiencing a modicum of distress because the mortgagor has stopped making payments on the mortgage, leaving the mortgagee little recourse but to sell the property to recoup all or part of the loan on which the mortgagor has defaulted. *See* Appraisal Institute, *Dictionary of Real Estate Appraisal* 150 (3rd ed 1993) (defining "foreclosure" and "foreclosure sale").[6] Plaintiff offered no testimony or other evidence that the auction sale following the prior owner's foreclosure was any different. That makes Plaintiff's reliance on the October 2010 foreclosure sale unpersuasive as an indicator of market value.

Defendant rejected the auction sale after studying the market in the area of the subject during the relevant time period. Defendant analyzed the market of "distressed" and "non-distressed" sales – foreclosures and short sales versus non-bank influenced sales described by Defendant as arm's-length – and found that "two stratified markets existed around the time of the assessment date justifying the exclusion of distressed and/or duress motivated transactions from RMV consideration." (Def's Ex A at 8.) Defendant analyzed a pool of sales from the two categories occurring between September 1, 2010 and March 31, 2011, and found a difference in the median sales price of approximately $100,000, with non-distressed sales occurring at the higher price. (*Id*. at 9.) Defendant also found a significant difference in the rate of depreciation between distressed and non-distressed sales from 2010 to 2011: roughly 34 percent for distressed

---

[6] That treatise defines "foreclosure" as "[t]he legal process in which a mortgagee forces the sale of a property to recover all or part of the loan on which the mortgagor has defaulted", and "foreclosure sale" as "[t]he optional right of the mortgagee or lending institution to sell mortgaged property if the mortgagor fails to make payment, applying proceeds from the sale toward the outstanding debt."

versus 11.11 percent for nondistressed sales. (*Id.*) That is a compelling statistic, although it comes from raw, unrefined data.

That type of data, plus other considerations explain this court's historical reluctance to consider "foreclosure" sales as "arm's-length transactions" because such sales "may well involve an element of compulsion on the part of the seller." *Kryl v. Lane County Assessor* (*Kryl*), TC-MD No 100192B, WL 1197444 *2 (Mar 30, 2011); *see also Knight Bridge Crossing, LLC v. Washington County Assessor*, TC-MD No 110238N, WL 176682 *4 (Jan 23, 2012); *Yarbrough v. Marion County Assessor*, TC-MD No 070229C, WL 4440216 at *4 (Dec 12, 2007).

In *Kryl*, the court rejected the taxpayer's foreclosure sale, which was the taxpayer's purchase of the subject property, even though it was close in time to the assessment date. *Kryl* TC-MD No 100192B, WL 1192444 at *2. The *Kryl* court held that the taxpayer failed to meet his burden of proof, stating that "[p]laintiff offered no competent evidence other than his own purchase price to support his *belief* that his purchase price was the subject property's real market value." *Id*. (emphasis added). The court explained the problem with blindly relying on foreclosure sales without having corroborating evidence to show that such transactions do in fact meet the arm's-length requirement and are therefore reliable indicators of market value. The court stated that:

> "[a] property purchased through foreclosure may well involve an element of compulsion on the part of the seller. There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months or more to find a buyer willing to pay a higher price."

*Id*.

/ / /

/ / /

Because there is no information that would persuade the court that the October 2010 auction price of $333,500 was in fact an arm's-length transaction between two willing parties, etc., the court places no weight on that sale in determining the RMV of the subject property.

Plaintiff also has his purchase price. Plaintiff bought the subject property from Chandler & Newville for $400,000 in July 2011. The home was listed for $439,000 at the time of Plaintiff's purchase. It had been listed for that amount for several months and was initially listed in March 2011 for $479,900. There are several problems with Plaintiff's purchase price. One is the conditions of the sale itself. The seller, Chandler & Newville, is apparently a small real estate investment company that buys and sells homes for a profit, and there is no way of gauging whether that company's sale to Plaintiff for $400,000 was motivated by typical market considerations (most notably a desire to exact the highest price feasible), or a need or desire to realize a quick profit, generate some cash, etc. Another is timing. Plaintiff purchased the home six months after the January 1, 2011, assessment date in an apparently declining market, which would suggest that the home was worth more than $400,000 on the assessment date. Furthermore, Plaintiff acknowledged on cross-examination that he had the property appraised just prior to his purchase and the independent fee appraiser estimated the value to be $450,000. If that appraiser's value estimate was accurate, and if the market was declining, as is likely the case based on Defendant's evidence, then the subject property may well have been worth $475,000 to $500,000, which is very close to the roll value.

As for the listing history, with the number of homes on the market in mid-2011, a four month listing period is not unusual and, as Defendant notes in its appraisal report, there could be numerous explanations why the subject property did not sell for $479,900. It was incumbent upon Plaintiff, who bore the burden of proof, to make that point. Plaintiff has failed to do so.

/ / /

Accordingly, Plaintiff has failed to establish an error in the record assessment by a preponderance of the evidence.

While that might seem to resolve the appeal, the legislature gave the court the statutory authority to determine the value of a property based on the evidence before it, regardless of the values pled by the parties. ORS 305.412. Accordingly, the court now turns to Defendant's evidence.

Defendant has an appraisal that places the value of Plaintiff's home at $505,000 as of January 1, 2011. That figure is slightly more than $100,000 above Plaintiff's post-assessment date purchase in July 2011, and nearly $175,000 above the prior owner's $333,500 purchase just three months before the January 1, 2011, assessment date. (Def's Ex A.) However, the court has already expressed its concerns with the subject's sales history.

Defendant's appraisal indicates that all three approaches to value were considered but only the sales comparison approach was utilized because the other two approaches were not deemed appropriate for a single-family owner occupied residential property. (*Id*. at 10-11.) That conclusion comports with settled law and the court's finding in this case. See *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979) (the valuation approach or approaches to be used is "a question of fact to be determined by the court upon the record").

Defendant analyzed three sales within two miles or less of the subject property that sold in August 2010, November 2010, and January 2011, which is the appropriate sales window for a January 1, 2011, assessment date. (Def's Ex A at 12.) Defendant's comparable sales prices ranged from a low of $493,000 to a high of $515,000. (*Id*.) Defendant made adjustments for time (based on a 12 percent annual market decline between January 1, 2010 and January 1, 2011[7]), location, view, size, condition, and garage size (single versus double), and arrived at an

---

[7] Defendant's Exhibit A at 10.

adjusted sale price range of $497,000 to $509,500. (*Id.*) Defendant made total positive net adjustments of $3,900 and $14,700 for comparable sales one and two, and a negative net adjustment of $7,250 for comparable sale number three. (*Id.*) Defendant's adjusted sale prices equate to per square-foot prices of $187, $182, and $169. (*Id.*)[8] Plaintiff's requested value of $333,500 translates to a per foot value of $121. Given that Plaintiff has two unreliable sales of the subject property and no appraisal or other persuasive market based valuation evidence, and Defendant presented an appraisal based on three sales of comparable properties occurring in close proximity to the assessment date, adjusted for differences as required by administrative rule and accepted appraisal methodology, the court finds that Plaintiff has failed to meet his burden of proof in establishing an error in the RMV as it currently stands on the assessment and tax rolls. Were the court not precluded by ORS 305.288(1) from reducing the RMV because of the 20 percent error rule, it would be inclined to reduce the RMV to the $505,000 value estimated by Defendant in its appraisal.[9] However, that statute bars such a change, which would be only a relatively minor adjustment to the rolls and a correspondingly nominal tax reduction.

C.      *Assessed value*

As a final matter, Plaintiff testified that he found a "huge disparity" between his property and other homes in terms of taxes, a problem he attributes to a long-standing inflated RMV that resulted in an inaccurate AV. By way of example, Plaintiff drew the court's attention to the fourth property in a table he prepared and submitted as part of Exhibit 6. That property is a home located at 1622 SW Westwood Drive, which sold in May 2011 for $509,000. Plaintiff argued that both that property and his $400,000 purchase occurred in mid-2011, yet the property

---

[8] Those per square-foot prices are based on the court's calculations, using Defendant's adjusted sale prices divided by the corresponding square footages listed for each of the three comparable sales.

[9] Defendant's representative Brown testified that the property was in compression and that any reduction in RMV would generate a small tax savings. Thus, aggrievement is not a problem. The 20 percent error threshold mandated by ORS 305.288 does present an obstacle; one not overcome by the evidence.

taxes on the home on SW Westwood Drive were approximately $6,000 compared to his $8,000 tax bill. Plaintiff's table actually indicates that the 2011 taxes on the other home were $6,593. Nonetheless, Plaintiff's point is that that home was sold for more than $100,000 more than he paid yet the taxes are more than $1,000 less.

The short answer to that argument is: that's the law. RMV represents the market value of a property. ORS 308.210 and ORS 308.232. It is the likely sales price. MAV was established in 1997 as 90 percent of the property's 1995 RMV on the rolls,[10] with annual increases thereafter of three percent.[11] ORS 308.146(1) (providing for annual three percent increases in MAV). For properties built after 1995, MAV is established as the property's RMV multiplied by the ratio of "the average maximum assessed value over the average real market value for the assessment year." ORS 308.153(1). Finally, AV is the lesser of the property's RMV or MAV. ORS 308.146(2). Oregon's somewhat unique property tax system does indeed create some disparity between properties viewed in any one of a number of ways. Nonetheless, the statutes referenced immediately above are the product of a constitutional amendment passed by the Oregon voters in 1997.[12] Moreover, this court addressed the disparity problem years ago in *Ellis v. Lorati*, 14 OTR 525, 535 (1999). The *Lorati* court stated:

> "The court recognizes that in one sense MAV is somewhat artificial or arbitrary. That is inherent in the overall scheme of [Measure 50]. The concept may, over time, result in various degrees of nonuniformity in the property tax system.

[10] Or Const, Art XI, §11(1)(a) (providing that a property shall have a MAV for the 1997-98 tax year "that does not exceed the property's real market value for the tax year beginning July 1, 1995, reduced by 10 percent").

[11] Or Const, Art XI, § 11(1)(b) (providing that "[f]or tax years beginning after July 1, 1997, the property's maximum assessed value shall not increase by more than three percent from the previous tax year"); ORS 308.146(1) (providing that MAV is the greater of 103 percent of the property's prior year AV, or 100 percent of the property's prior year MAV).

[12] Article XI, section 11 of the Oregon Constitution was adopted by the people at a special election held in May 1997. The new section 11 imposed a maximum assessed value (MAV) on each property initially measured (for the 1997-98 tax year) by the property's 1995 RMV, less ten percent. It also limited the tax rates that could be imposed by taxing districts. Paragraph (1)(b) of Article 11, section 11, provides: "[f]or tax years beginning after July 1, 1997, the property's maximum assessed value shall not increase by more than three percent from the previous tax year."

DECISION TC-MD 120719C                                                                    13

Section 11(18) [of the Oregon Constitution] contemplates this and excuses itself from complying with other constitutional provisions requiring uniformity * * *."

Plaintiff has not shown that there is an error in the mathematical calculation of the MAV of his property. His home was built in 1999 and the MAV was established at that time as a percentage of the RMV on the assessment and tax rolls. Given the court's conclusion that no reduction in RMV was warranted, there can be no reduction in the subject property's AV, which was Plaintiff's ultimate goal in this case, as such a reduction would reduce his tax burden. The original MAV determination which so bothers Plaintiff, as explained in his exhibit 7, is not amenable to change at this point.[13] That point was made clear by this court in a number of cases, including *Kaufman v. Dept. of Rev.* (*Kaufman*), TC 4932, WL 2930866 (Jul 27, 2010), where the court noted that if a taxpayer, or predecessor in title, fails to timely challenge an alleged erroneous RMV leading to a possibly incorrect MAV and AV, the MAV is locked in and cannot be changed. *See Kaufman*, TC 4932, WL 2930688 at *3-5. The court ruled similarly in *Gall v. Dept. of Rev.*, 17 OTR 268, 270 (2003), stating that "[u]nder Measure 50 and the statutes implementing it, there is no linkage between the [real market value] and [the maximum assessed value]. Instead, each value is determined and one of the two, the lesser, becomes, in any given year, the assessed value * * * for the property."

### III. CONCLUSION

The court concludes that Plaintiff has failed to establish an error in the real market value of the subject property and that, while Defendant's evidence suggests a slight reduction might be in order, the court is precluded by ORS 305.288(1) from reducing the property's RMV because

---

[13] Plaintiff states in his written narrative that: "[t]here is a clear disparity in the Multnomah County given RMV versus the actual RMV. Obviously, the result of any formula can only be as accurate as its input. The following table shows that because the RMV is so inflated, it follows that the Assessed Value does not properly calibrate to an accurate minimum as min (RMV, MAV) is going to be the MAV. As long as the RMV is inflated high enough, the minimum will always b[e] the MAV which will in turn be the prior year's Assessed Value * 1.03 until this MAV reaches the RMV." (Ptf's Ex 7 at 1.)

the indicated error in value of less than three percent is well below the statutory 20 percent threshold. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied and the values currently on the assessment and tax rolls for the 2011-12 tax year shall remain undisturbed for the property identified in the assessor's records as Account R273439.

Dated this ____ day of February 2013.

DAN ROBINSON
MAGISTRATE

***If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.***

***This Decision was signed by Magistrate Dan Robinson on February 12, 2013. The Court filed and entered this Decision on February 12, 2013.***