IN THE TAX COURT OF THE
STATE OF OREGON

Robert ELLIS,
Multnomah County Assessor,
or his successor in office,
*and*

DEPARTMENT OF REVENUE,
*Intervenor*

*v.*

David LORATI

(TC 4306)

Robert ELLIS,
Multnomah County Assessor,
or his successor in office,
*and*

DEPARTMENT OF REVENUE,
*Intervenor*

*v.*

Deanna D. NEBERT

(TC 4316)

Robert ELLIS,
Multnomah County Assessor,
or his successor in office,
*and*

DEPARTMENT OF REVENUE,
*Intervenor*

*v.*

Janet LIU

(TC 4317)

Robert ELLIS,
Multnomah County Assessor,
or his successor in office,
*and*

DEPARTMENT OF REVENUE,
*Intervenor*

*v.*

Mark D. SCHAAF
and Karen F. Schaaf

(TC 4318)

Robert ELLIS,
Multnomah County Assessor,
or his successor in office,

*and*

DEPARTMENT OF REVENUE,
*Intervenor*

*v.*

Ronald R. RUEBUSCH
and Alison Ruebusch

(TC 4319)

Robert ELLIS,
Multnomah County Assessor,
or his successor in office,

*and*

DEPARTMENT OF REVENUE,
*Intervenor.*

*v.*

Robert J. TALLMAN
and Ava M. Tallman

(TC 4324)

John S. Thomas, Assistant County Counsel, Multnomah County Counsel, Portland, represented Plaintiff.

Rochelle Nedeau, Assistant Attorney General, Department of Justice, Salem, represented Intervenor.

David L. Canary, Garvey, Schubert & Barer, Portland, represented Defendants (taxpayers).

Decision for Plaintiff and Intervenor rendered February 23, 1999.

### CARL N. BYERS, Judge.

In all of these appeals, Defendants (taxpayers) challenge their 1997-98 maximum assessed value (MAV). In each case, the magistrate held that Article XI, section 11, of the Oregon Constitution, allows a taxpayer to show a lesser 1995-96 real market value when contesting their 1997-98

MAV. The Multnomah County Assessor appealed each Decision to the Regular Division of this court, and the Department of Revenue has intervened. There is no dispute of material fact. Therefore, all of the appeals have been consolidated for decision and submitted to the court on cross motions for summary judgment.[1]

## FACTS

In all of the cases, the subject property is taxpayer's personal residence. In all of the cases except one, taxpayers purchased the property *after* July 1, 1995, for an amount less than the real market value shown on the July 1, 1995, assessment roll. All of these taxpayers were successful in the Magistrate Division in establishing that their property's real market value for the tax year beginning July 1, 1996, was less than the assessed value for the 1995-96 tax year.

One set of taxpayers, the Schaafs, owned their property since 1993, but were unaware that its real market value was less than its assessed value until they refinanced their home. The refinancing appraisal indicated that the real market value in 1996 was less than the amount shown on the 1995-96 tax roll. Through evidence submitted at the board of property tax appeals, the Schaafs established that the real market value of their property was less in 1996 than was shown on the 1995-96 tax roll.

In short, for the reasons indicated, none of the taxpayers appealed in 1995 to contest their real market value. However, all of the taxpayers appealed their July 1, 1997, MAV. All of the taxpayers contend that they now have a right to prove that the 1995-96 real market value on the tax roll was excessive and therefore their MAV for 1997-98 is less.

## ISSUE

Does Article XI, section 11, of the Oregon Constitution, permit a taxpayer to challenge the real market value shown on the tax roll for 1995-96 in contesting the property's MAV for the tax year beginning July 1, 1997?

---

[1] Consolidation allowed taxpayers to pool their resources and employ an experienced attorney who has excellently presented legal arguments on difficult constitutional questions.

## ANALYSIS

■ This court's responsibility is to construe section 11 consistent with the intent of the voters who adopted the measure.[2]

"In interpreting a constitutional provision adopted through the initiative process, our task is to discern the intent of the voters. The best evidence of the voters' intent is the text of the provision itself." *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993).

■ Under principles enunciated by the Oregon Supreme Court, this court begins its search for the intent of the people by considering the text and context of the law. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). If careful analysis of the text and context does not reveal a clear intent, then the court may consider legislative history or historical circumstances. As noted by the Supreme Court in *Coultas v. City of Sutherlin*, 318 Or 584, 590, 871 P2d 465 (1994):

"It is an unusual case in which the text and context of a constitutional provision reflect the intent of the voters so clearly that no alternative reading of the provision is possible. Ordinarily, this court will examine the history of a constitutional provision if there is a plausible alternative reading presented to the court." (Footnote omitted.)

■ Article XI, section 11, of the Oregon Constitution, was adopted by the people at a special election held in May 1997. Section 11 imposes an overall limitation on property taxes by establishing a MAV for each unit of property and establishing a permanent tax rate. Two paragraphs, paragraph (a) and (g), of section 11(1) directly bear upon the issue before the court. Paragraph (a) of section 11(1) states:

"* * * For the tax year beginning July 1, 1997, each unit of property in this state shall have a maximum assessed value for ad valorem property tax purposes that does not exceed the property's *real market value for the tax year* beginning July 1, 1995, reduced by 10 percent." (Emphasis added.)

---

[2] "The constitution derives its force and effect from the people who ratified it and not from the proceedings of the convention where it was framed * * *." *Monaghan v. School District No. 1*, 211 Or 360, 367, 315 P2d 797 (1957).

This court has recently construed "each unit of property" to mean each assessable unit of property. Oregon's property tax system has long provided for separate assessments of land, improvements, and personal property. Accordingly, the court has concluded that each category constitutes a "unit of property" that has its own real market value, assessed value, and MAV. *See Taylor v. Clackamas County Assessor (I)*, 14 OTR 504, 509 (1999).

Taxpayers contend that the words "real market value" in paragraph (a) mean just that, the real market value of the property, not its assessed value. They point out that assessors' estimates of value are not the same thing as real market value. In opposition, Plaintiff and Intervenor contend that paragraph (a) is referring to the real market value as shown on the tax and assessment roll as of July 1, 1995. Taxpayers respond that if the voters had intended or meant the real market value shown on the roll, then they would have so stated. This latter point is not necessarily true as seen in *Cascade Steel Rolling Mills, Inc. v. Dept. of Rev.*, 13 OTR 252, 257 (1995), a case cited by taxpayers in support of their Petition. In that case, this court held that when the legislature specified "real market value" in ORS 309.100, it must have intended the assessor's "estimate" of real market value.

Taxpayers' arguments have facile appeal, but do not hold up upon close examination. The words "real market value" in paragraph (a) are immediately followed by the words "for the tax year." These latter words modify or identify which real market value is to be used. They appear to refer to the value that was used for purposes of assessment and taxation. While it is possible that the voters intended to refer to the property's actual real market value during the tax year, it is unlikely. Such an abstract meaning would have no direct relationship with the property tax system. Trying to force the meaning down that path leads to a numberless nowhere.

If the court assumes that section 11(1)(a) does not refer to the real market value shown on the roll, then the next question must be: Where does the number come from? Certainly section 11 recognizes that property taxes must be administered. If a MAV is to be established, then the real

market value for every parcel of property as of July 1, 1995, must be ascertained. There are only a limited number of possibilities: (1) sale of the subject properties, (2) government appraisals, (3) taxpayer appraisals, and (4) existing property tax records.

■      By May 1997 when the voters passed Measure 50, they knew that every parcel of property in Oregon had not sold on July 1, 1995. It is only slightly less ludicrous to consider whether the voters intended assessors or taxpayers to assess every parcel of property. That leaves only one explanation: the words "real market value" in paragraph (a) were intended to refer to the amount shown as the real market value on the assessment and tax roll for July 1, 1995. That view is consistent with the administrative needs of the property tax system. The assessors of each county were required to compute a MAV for every parcel of property. That was feasible only by using the real market value from the July 1, 1995, assessment and tax roll.

The second paragraph directly bearing upon the issue before the court, paragraph (g) of section 11(1), states:

"There shall not be a reappraisal of the *real market value used* in the tax year beginning July 1, 1995, for purposes of determining the property's maximum assessed value under paragraph (a) of this subsection." (Emphasis added.)

The specific terms used in context are sufficiently ill-fitted so as to create ambiguities and questions. The word "reappraisal" does not fit well with the words "real market value." "Value" is not a usual object of the word "appraisal." In this context, value is not appraised, property is appraised. Probably what the voters intended to say is that there shall not be a reappraisal of the property's real market value.

■      Section 11(1)(g) specifies that the real market value in question is that which was "used" in the tax year beginning July 1, 1995. The common, ordinary meaning of the word "used," is that it was applied to accomplish something. To be "used in the tax year beginning July 1, 1995," suggests that the real market value was employed in some fashion in that year. The most obvious and common use was the real market

value on the assessment roll. That would be a clear, exact number. It would also be a number assessors could use to calculate MAV for the 1997-98 tax year.

Whatever the "actual" real market value of each property was in 1995, only the real market value on the assessment and tax roll was "used" for that tax year. The value that taxpayers assert, even though supported by evidence, was not the value "used" either by them or by the assessor for the 1995-96 tax year. Consequently, the voters must have intended the words "real market value" to refer to the real market value shown on the tax and assessment roll for 1995-96.

■   Because paragraph (g) refers to paragraph (a), the two paragraphs may be read together for their collective meaning. It should be apparent that there would be no point in prohibiting a *reappraisal* unless property has been previously appraised. To prohibit a reappraisal is a direction that the prior appraisal shall not be disturbed or overturned. The only "appraisal" that would have applied to every parcel of property in Oregon would have been property tax appraisals. Therefore, the real market value in paragraph (g) must be the value that was "used" as described in paragraph (a) "for the tax year." Both paragraphs contemplate a real market value that was employed in administering the property tax system for the tax year beginning July 1, 1995. Any "actual" real market value as contended for by taxpayers would not have been used or necessarily been "for the tax year."

Contrary to taxpayers' assertions, the court concludes that the voters intended to refer to the real market value on the assessment and tax roll precisely because it did provide certainty. By the spring of 1997 there would have been few properties whose real market value was still in question. It is significant that the voters selected July 1, 1995. That date became the starting point for all future calculations of MAV and is significant because section 11 also requires the establishment of permanent tax rates. Establishing permanent tax rates suggests the need for certainty in the calculation of those rates. Allowing property owners to

appeal and change the real market value used for the 1995-96 tax year is inconsistent with the establishment of permanent tax rates.

Because the concept of MAV in paragraph (a) is unusual and the phrasing in paragraph (g) raises questions, the court has considered the legislative history of section 11. As observed in *Taylor (I)*:

> "This section had an unusual beginning. By initiative Measure 47, adopted at the November 1996 general election, Oregon voters enacted a constitutional amendment limiting property taxes. However, after studying that amendment for the purpose of enacting conforming and implementing legislation, the legislature concluded that Measure 47 presented too many legal questions, unattended consequences, and difficulties. It therefore drafted a revised Measure 47, and referred the revised measure to the people as Measure 50. At a special election in May 1997, the voters adopted Measure 50, thereby repealing Measure 47." *Taylor (I)*, 14 OTR 504, 506-07 (1999).

Measure 47 was a direct limitation on the amount of property taxes that could be imposed. Measure 50 (section 11) took a different route to accomplish the same thing. It limited the assessed value of property *and* established a permanent tax rate. The Explanatory Statement furnished by the legislature that drafted Measure 50 and contained in the Voters' Pamphlet states:

> "Reduces the maximum assessed value of property for the 1997-1998 tax year to 90 percent of the *property's assessed value* for the 1995-1996 tax year." (Emphasis added.)

As of July 1, 1995, ORS 308.232 required property to be assessed at 100 percent of its real market value. Thus, the explanation in the Voters' Pamphlet indicating that the MAV would be reduced to 90 percent of the property's "assessed value" for the 1995-96 tax year would be understood to refer to the property's real market value used for that year. More important, there is no language anywhere in the Voters' Pamphlet that suggests that the foundation or starting number for calculating MAV could be appealed or changed.

Taxpayers make other arguments, which the court finds unpersuasive. They argue that section 11(1)(g) is a restriction only on the assessor—that the voters would not restrict their own rights of appeal. Making assumptions about what the voters intended in these circumstances is mere speculation in the absence of any language in the constitution addressing appeal rights.

As noted above, Measure 50 was intended to accomplish the same thing as Measure 47, which is to limit property taxes. What the voters may have understood with regard to how the assessed value of property affects the permanency of the tax rate is unknown. There is no mention of rights of appeals in section 11 or the Voters' Pamphlet. Consequently, it is just as likely the voters believed that by using the July 1, 1995, value, less 10 percent, there was no need for anyone to appeal.

The greatest obstacle faced by taxpayers is the language of section 11(1)(g) itself. The prohibition against reappraisal is unconditioned and unlimited. It proscribes any reappraisal. Whether real market value refers to "actual" or assessed, a reappraisal is prohibited.

Paragraph (g) is clearly intended to prevent going back in history and revising each property's MAV starting point. To allow taxpayers to challenge their 1995 real market value would make paragraph (g) of no effect. By selecting a real market value as of July 1, 1995, almost two years earlier, the voters provided a margin of time that, in a general sense, would have assured a higher value in 1997. By specifying "less 10 percent," the voters established an additional margin so that all voters might feel comfortable that the starting point for calculating MAV would be at least less than the real market value in 1997.

Based upon the above analysis, the court concludes that taxpayers appealing their July 1, 1997, MAV may not challenge the real market value shown on the tax roll for July 1, 1995.[3]

---

[3] Of course, if taxpayers believe that the amount used was not the amount shown on the tax roll or that their MAV is incorrectly calculated, then they may appeal on such grounds.

The court recognizes that in one sense MAV is somewhat artificial or arbitrary. That is inherent in the overall scheme of section 11. The concept may, over time, result in various degrees of nonuniformity in the property tax system. Section 11(18) contemplates this and excuses itself from complying with other constitutional provisions requiring uniformity, specifically Article IX, section 1, and Article I, section 32.

Having resolved the issue before the court; now, therefore,

IT IS ORDERED that Plaintiff's and Intervenor's Motion for Summary Judgment is granted, and

IT IS FURTHER ORDERED that Defendants' Motions for Summary Judgment are denied. Costs to neither party.