IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PATRICK K. LEWALLEN, Trustee, and )
CAROL Y. LEWALLEN, Trustee, )
                                 )
       Plaintiffs, )   TC-MD 190081N
                                 )
   v. )
                                 )
DESCHUTES COUNTY ASSESSOR, )
                                 )
       Defendant. )   **DECISION**

Plaintiffs appeal the real market value of property identified as Account 248602 (subject property) for the 2018-19 tax year. A telephone trial was held on July 2, 2019. Patrick K. Lewallen (Lewallen) appeared and testified on behalf of Plaintiffs. Stein Totland (Totland) appeared and testified on behalf of Defendant. Todd Straughan (Straughan) also testified on behalf of Defendant. Plaintiffs' Exhibits 1 to 9 and Defendant's Exhibit A were received without objection.

I.  STATEMENT OF FACTS

The subject property is a lot located within the North Rim on Awbrey Butte subdivision (North Rim), which contains 121 homesites. (Def's Ex A at 1.) The subdivision lots have "a mix of mountain, high desert, and Deschutes River views." (*Id.*) Lewallen testified that North Rim was developed in phases starting in 2003 through 2005. (*See also* Ptfs' Ex 2.) The subject property is part of phase 3. (*See id.*) Lewallen testified that the subject property has some trees and limited mountain views. He testified that the best views in North Rim are on the rim and overlooking the Deschutes River. (*See also* Ptfs' Ex 3 (map of development).)

The subject property's original owners purchased it for $600,000 in 2005 and held it until 2014 when they listed it for sale. (Ptfs' Ex 2.) Lewallen testified that the original sale price was

probably over market by at least $200,000. He testified that the subject property's maximum assessed value[1] was set at the time of the $600,000 sale and is much higher than neighboring properties. Lewallen testified that Plaintiffs purchased the subject property for $400,000 in March 2018 with the intention of building a home and moving to Bend from Portland. (*See id.*)

Defendant initially determined a 2018-19 real market value of $435,000 for the subject property based on its neighborhood study. At the board of property tax appeals (BOPTA) hearing, the board recommended a reduction of the real market value to $400,000, based on Plaintiffs' purchase price. BOPTA reduced the subject property's real market value to $400,000. Plaintiffs request a 2018-19 real market value of $322,063, based on the average sale price of properties within the North Rim development. The subject property's 2018-19 maximum assessed value was $371,520.

A.    *Plaintiffs' Value Evidence*

Lewallen testified that he worked with his realtor to research all the sales from North Rim close to the January 1, 2018, assessment date. (*See* Ptfs' Ex 4.) He found the average sale price in 2018 was $322,063. (*See id.*) Lewallen testified that 2019 data from North Rim revealed an average listing price of $330,250 and an average sale price of $291,500. (*See* Ptfs' Ex 5.) For sales that occurred between October 1, 2018, and February 28, 2019, the average sale price was $313,600. (Ptfs' Ex 6.) Lewallen testified that he received an unsolicited offer in the mail to purchase the subject property for $221,440. (*See* Ptfs' Ex 7.) Although he considered that price too low, he thought it was somewhat indicative of a reasonable price to a potential buyer.

/ / /

/ / /

---

[1] Lewallen referred to the taxable value, which the court understood to mean maximum assessed value.

Lewallen testified that he reviewed the 2018-19 tax burdens of neighboring properties, finding the average to be $3,867 whereas the subject property's tax was $5,766. (*See* Ptfs' Ex 8.) Plaintiffs paid more property tax than some superior view lots on the rim. (*See id.*)

B.      *Defendant's Value Evidence*

Totland testified that he gathered North Rim sales from April 1, 2017, to September 30, 2018. (Def's Ex A at 3.) The subject property sale was the closest to January 1, 2018. (*See id.*) Of those sales, he found three to be the most comparable, in addition to the subject property sale. (*See id.* at 6.) However, he ultimately excluded lot 38 from consideration upon learning it was a sale between friends.[2] (*See id.* at 6.) Totland's comparable sales sold from $389,000 to $437,000. (*Id.*) He testified that he did not make dollar adjustments to the sales, but rather, grouped lots from North Rim into four categories based on view, topography, and traffic. (*See id.* at 2, 5-6.) Totland testified that the subject property is in the second-best group, labeled "Premium #2," and he selected comparable sales from that group. (*See id.*) He testified that many of the worst lots – "Negative Location Lots" – are located on Puccoon Court. (*See id.*) The views are "territorial" and not comparable to mountain view lots. (*See id.* at 9.)

As additional support for the lot categories, Totland testified that he compared sale prices of 11 North Rim lots that sold between 2004 and 2006 and resold in 2017 to 2019. (*See* Def's Ex A at 4.) Most lots sold for less in 2017 to 2019. (*See id.*) The subject property sold for 67 percent of its initial sale price, which was the median percentage for the group of lots. (*See id.*) Straughan testified that, despite changes over time in the sales prices, the relative differences

/ / /

_____

[2] Lot 38, which Totland initially included as comparable, sold for $395,000. (Def's Ex A at 6.) Straughan testified that a sale between friends or family is typically below market, so lot 38 still supports the subject property's real market value of $400,000.

between lots is constant because the market has always recognized differences in topography, views, and traffic. (*See id.*)

Lewallen testified that every lot in North Rim is different and special. He questioned whether Defendant's appraisal was sufficiently detailed and accurate. Straughn testified that the four lot categories developed for North Rim are intended to capture relevant market forces. He testified that North Rim is a unique area because adjacent properties can have very different topography and views, yielding different sale prices. Straughn testified that averaging values does not accurately capture value due to the variety of lots in North Rim. He considered Plaintiffs' purchase price to be the best evidence of the subject property's real market value.

## II. ANALYSIS

The issue presented is the subject property's real market value for the 2018-19 tax year. Although Plaintiffs did not directly challenge the subject property's 2018-19 maximum assessed value, they expressed concern with that value as compared with neighboring properties.

As the parties seeking affirmative relief, Plaintiffs bear the burden of proof by a preponderance of the evidence. ORS 305.427.[3] A "[p]reponderance of the evidence means the greater weight of the evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

/ / /

/ / /

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

A.      *Real Market Value*

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *2 (Or Tax M Div Mar 26, 2003), citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995). "Real market value" is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). The assessment date for the 2018-19 tax year was January 1, 2018. ORS 308.007; ORS 308.210.

Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a)[4]; *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). Although all three approaches must be considered, all three approaches may not be applicable in each case. *Id.* In addition to the three approaches to value, a recent sale of the subject property "is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973).

Of the three approaches to value, the parties each considered only the sales comparison approach. The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp. v. Lane County Assessor,* TC-MD 060354D, WL 1068455 at *3 (Apr 3, 2007), citing Appraisal Institute, *The*

---

[4] Oregon Administrative Rule (OAR).

*Appraisal of Real* Estate 335 (12th ed 2001). "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions." OAR 150-308-0240(2)(c).

Plaintiffs purchased the subject property for $400,000 a few months after the January 1, 2018, assessment date. Under *Kem*, Plaintiffs' purchase is good evidence of the subject property's real market value. Plaintiffs maintain that they overpaid and the correct real market value should be determined based on the average of sale prices in North Rim. Averaging might be an appropriate technique if all properties considered are similar or if adjustments for differences have been made. Here, however, Defendant presented persuasive evidence that the lots in North Rim vary based on their topography, views, and traffic patterns yielding a wide range of sale prices. That pattern is demonstrated within Plaintiffs' evidence: 2018 North Rim sales with "wooded" views sold for $182,500 to $230,000 whereas sales with "unobstructed" views sold for $437,000 to $463,000. (*See* Ptfs' Ex 4.) Defendant presented persuasive evidence of comparable sales from North Rim that supported the subject property sale price of $400,000 as its real market value as of January 1, 2018.

B.      *Uniformity*

Plaintiffs presented evidence of the subject property's tax burden relative to neighboring lots. They noted the fundamental unfairness of having to pay more property tax than a superior lot. In essence, Plaintiffs challenge the subject property's maximum assessed value based on a lack of uniformity.

Measure 50 was approved by Oregon voters in 1997. *See Ellis v. Lorati*, 14 OTR 525, 529 (1999). It amended the Oregon Constitution to "impose[] an overall limitation on property

taxes by establishing a [maximum assessed value] for each unit of property and establishing a permanent tax rate." *Id.*  In creating the new concept of maximum assessed value and its limit on property tax increases, a lack of uniformity was anticipated, and Measure 50 explicitly exempts itself from the Constitutional uniformity requirements.  *See* Or Const, Art I, § 32; Art IX, § 1; Art XI, § 11(18) (exempting Measure 50 from uniformity provisions); *see also Ellis v. Lorati*, 14 OTR 525, 535 (1999) (observing that the concept of maximum assessed value "may, over time, result in various degrees of nonuniformity in the property tax system.  Section 11(18) contemplates this and excuses itself from complying with other constitutional provisions requiring uniformity, specifically Article IX, section 1 and Article I, section 32.").)

After the passage of Measure 50, a taxpayer's claim based on lack of uniformity in the amount of tax assessed as compared with neighboring properties is unlikely to succeed because the constitutional provisions requiring uniformity do not apply to maximum assessed value.  *See, e.g., Vandiver v. Deschutes County Assessor*, TC-MD 080384D, WL 3876099 at **1-2 (Aug 18, 2008) (holding that the court lacked authority to correct maximum assessed value where the taxpayer paid more property taxes "than a neighboring property with a same year manufactured home"); *Mathers v. Deschutes County Assessor*, TC-MD 110130N, WL 5983312 at **6-7 (Nov 30, 2011) (holding the court lacked authority to correct maximum assessed value where the taxpayer's maximum assessed value was higher than "neighboring, similar and superior properties") (emphasis added).  The same is true in this case.  There is no basis under the law to change the subject property's maximum assessed value based on neighboring properties.

## III.  CONCLUSION

Upon careful consideration, the court concludes that the subject property's 2018-19 real market value was $400,000.  Accordingly, no further change to real market value is supported.

The court further concludes that no change to maximum assessed value is allowed based on the values assigned to neighboring properties.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of October 2019.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer and entered on October 1, 2019.*