IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JOHN & BARBARA MOORE FAMILY    )
REVOCABLE TRUST,    )
   )
      Plaintiff,    )    TC-MD 210339N
   )
      v.    )
   )
JACKSON COUNTY ASSESSOR,    )    **ORDER DENYING PLAINTIFF'S**
   )    **MOTION FOR SUMMARY**
      Defendant.    )    **JUDGMENT**

Plaintiff appeals the value of property identified as Account 10890676 (subject property) for the 2020-21 tax year. Plaintiff filed a Motion for Summary Judgment (Motion) in support of its claims to reduce the subject property's real market value and maximum assessed value.

## I. STATEMENT OF FACTS

The subject property is a 3,217-square foot home built in 1998 with three bedrooms and three and one-half bathrooms, situated on a 0.44-acre lot in the Eagle Point Golf Community (EPGC). (Ptf's Mot at Ex 1.) Plaintiff purchased the subject property for $495,000 on February 13, 2020.[1] (Compl at 5; Ptf's Mot at Ex 1.) Defendant originally assigned a 2020-21 real market value of $625,670 to the subject property but reduced the value to $550,210 after Plaintiff contacted Defendant's office about the sale. (*Id.* at 2, 7.) The board of property tax appeals (BOPTA) sustained the subject property's 2020-21 real market value of $550,210. (*Id.* at 4.) The subject property's 2020-21 maximum assessed value was $577,100, and its assessed value was $550,210, equal to its tax roll real market value. (*Id.*) The subject property was originally

_____

[1] Plaintiff wrote that its offer was accepted on December 31, 2019. (Compl at 8, Ex 4.)

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT   TC-MD 210339N           1

assessed property taxes of $8,774.63 based on an assessed value of $577,100.[2] (*Id.* at 7.) Plaintiff requests a real market value of $495,000, and a maximum assessed value in the range of $334,600 to $477,000.[3] (Compl at 2; Ptf's Mot at 8; Ptf's Reply at 11.)

A.    *Subject Property Value History*

The subject home was new property added as exception value in the 1999-00 and 2000-01 tax years. (*See* Def's Ex A.) Property tax records reveal the following values:

| Tax Year | RMV | MAV | AV | Notes |
|---|---|---|---|---|
| 1997 | $201,500 | $174,390 | $174,390 | New lot, exception |
| 1998 | $137,000 | $179,620 | $137,000 | |
| 1999 | $283,590 | $330,470 | $283,590 | New house 79% complete, exception |
| 2000 | $370,480 | $375,570 | $370,480 | New house 100% complete, exception |
| 2001 | $360,360 | $381,590 | $360,360 | BOPTA appeal, RMV reduced |

(*Id.*) The changed property ratios (CPRs) applicable to the subject property when exception values were added were 0.847 in 1999 and 0.841 in 2000. (Ptf's Reply, Ex 5.) Over time, the CPR for the subject property's class and location has ranged from a low of 0.482 in 2007 to a high of 0.966 in 2012. (*Id.*) It was 0.676 in 2020. (*Id.*)

Historically, the subject property's assessed value has been based on its real market value for 10 years, including the 2020-21 tax year, and based on its maximum assessed value for 14 years. (Def's Ex A.) In 1997, the subject property's assessed value was its maximum assessed value. (*Id.*) From 1998 through 2002, its assessed value was equal to its real market value. (*Id.*) From 2003 through 2009, the subject property's assessed value was equal to its maximum assessed value. (*Id.*) From 2010 through 2013, its assessed value was equal to its real market

---

[2] It is unclear the amount by which the subject property's 2020-21 taxes were reduced based on the revised real market value and assessed value.

[3] Plaintiff's requested maximum assessed value is unclear. It originally requested $365,000 in the Complaint but identified different figures in subsequent briefs.

value, thereby freezing its maximum assessed value until 2015. (*Id.*) From 2014 through 2019, the subject property's assessed value was equal to its maximum assessed value. (*Id.*)

B.      *Neighborhood Property Values*

Plaintiff supplied a list of properties in the EPGC with real market values exceeding $450,000. (Compl at 8, Ex 4.) The real market value of each of those properties exceeds its maximum assessed value. (*Id.*) The taxes assessed on those properties range from $4,588 for a property with a real market value of $463,600 to $9,098 for a property with a real market value of $849,550. (*Id.*) The second highest property tax assessment on the list is the subject property at $8,775. (*Id.*) Plaintiff notes that a property located one mile from the subject in the EPGC has a real market value of $852,000 and a maximum assessed value of $463,440, so its owners paid $1,579 less in 2020-21 property taxes than Plaintiff. (Ptf's Reply at 10.)

C.      *2010 Legislative Report on Measure 50*

Plaintiff provided a 2010 Research Report from the Legislative Revenue Office entitled "Oregon's Property Tax System: Horizontal Inequities Under Measure 50." (Ptf's Reply, App A at 1.) It defines "horizontal equity" as "equals are treated equally under the tax system or those with the same ability to pay, pay the same amount of taxes." (*Id.* at 4.) Property tax based on real market value achieves horizontal equity because it is based on market sales, but "Measure 50, by separating assessed value from market value, virtually assured that this definition of horizontal equity would be violated." (*Id.* at 4-5.) Based on testimony, an analysis by Multnomah County, and an examination of Measure 50's mechanics, the report found "that the property tax system is subject to widespread horizontal inequities where taxpayers in equal circumstances are treated differently by the tax system." (*Id.* at 1.)

/ / /

Measure 50 was designed to address unpredictable tax bills in a rapidly rising market, as well as imbalances between classes of property, especially residential, commercial, and industrial. (Ptf's Reply, App A at 4.) Measure 50 largely achieved those goals. (*Id.*)

> "However, the Legislature recognized that the predictability provided by Measure 50 would inevitably lead to variations in assessed value relative to market value for individual properties. This meant that homes with the same market value could be paying widely different property taxes under Measure 50.

> "In recognition of this likely outcome, Measure 50 contains language that exempts it from other provisions of the constitution that guarantee uniform tax treatment."

(*Id.*) "The designers of Measure 50 recognized that the loss of equity among similarly valued properties was the cost of providing predictability for annual property tax bills." (*Id.* at 8.)

Several features of Measure 50 drive inequities over time: 1) any existing inequity in the 1995 real market value used to set the 1997-98 maximum assessed value; 2) differential growth rates of residential properties by time and location; and 3) maximum assessed value of new construction based on the CPR, which is an average, resulting in some ratios being higher and some lower. (Ptf's Reply, App A at 5-6.) The report authors performed "an in-depth analysis of variations in the ratio of assessed value to real market value after 10 years under Measure 50." (*Id.* at 9.) They studied four counties, including Jackson, finding that "maximum assessed value is the basis for property taxes for nearly all residential property in the four counties." (*Id.*) In Jackson County, 0.3 percent of residential properties (129 out of 41,321) had an assessed value equal to real market value. (*Id.* at 10.) The authors found "no clearly discernible relationship" between market values and assessed values. (*Id.*) "In other words, there is no systematic increase or decrease in the ratio as real market value rises." (*Id.*)

/ / /

/ / /

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT  TC-MD 210339N                                                                                                          4

## II. PARTIES' POSITIONS

Plaintiff claims that the subject property's maximum assessed value violates Article 1, section 20 of the Oregon Constitution and section 1 of the Fourteenth Amendment to the United States Constitution because it denies Plaintiff equal treatment with other similar property owners. (Ptf's Mot at 2.) Plaintiff requests to be "constitutionally equal to other owners." (Compl at 2.) Plaintiff is *not* arguing that Measure 50 is unconstitutional, only that the subject property was denied its benefits due to the arbitrary and discriminatory conduct of Defendant. (Ptf's Mot at 7.) Other than the subject property, no homes in the EPGC had an assessed value equal to real market value. (*Id.* at 3.) Thus, those homes enjoyed tax savings from Measure 50 whereas the subject property did not. (*Id.* at 7.) Plaintiff alleges that higher value homes have tax burdens that are $3,000 to $4,000 less than the subject. (Ptf's Reply at 5.) In Plaintiff's view, that is "arbitrary or systematic discrimination" under *Penn Phillips Lands v. State Tax Comm'n*, 247 Or 380, 430 P2d 349 (1967) and *Sioux City Bridge v. Dakota County*, 260 US 441, 43 S Ct 190, 67 L Ed 340 (1923). (Ptf's Mot at 3.)

Plaintiff identifies the source of the discrimination as the subject property's maximum assessed values from 1998 to 2000, which were a "massive mistake," noting the relatively high CPRs during those years. (Ptf's Mot at 2, 7-8.) Plaintiff alleges that the subject property's 2000 maximum assessed value was incorrect and overstated by $60,000. (Ptf's Reply at 5-6.) Homes built before 2004 in the EPGC "were severely over valued" resulting in excessive maximum assessed values compared to homes built after 2004. (*Id.* at 9.) Plaintiff claims that the subject property "has never enjoyed the benefits of Measure 50" and "has suffered taxes higher than it would have without Measure 50." (*Id.* at 6-7.) Plaintiff maintains that a buyer has no way of knowing a property's tax liability, thus cannot choose between a property with a high maximum

assessed value versus a low maximum assessed value. (*Id.* at 5, 9-10.) As a remedy, Plaintiff asks the court to recalculate the subject property's 2000 maximum assessed value to give Plaintiff the benefit of CPR comparable to other properties in the EPGC. (*Id.* at 11.)

Defendant asserts that it follows ORS 308.146 through 308.166 in calculating maximum assessed value. (Resp at 1.) It is not aware of any mistake in the subject property's maximum assessed value in 1998 to 2000. (*Id.*) Even if a mistake occurred, it is not correctible under ORS 311.205. (*Id.*) The prior owners of the subject property had the right and duty to appeal if they believed values were in error. (*Id.*) Indeed, the owner appealed in 2001 resulting in a reduction to land value. (*Id.*) Defendant distinguishes *Penn Phillips Lands* because it involved real market value, not maximum assessed value. (*Id.* at 2.) In Defendant's view, *Theda v. Department of Revenue*, 20 OTR 237 (2010), controls the outcome here because it involved a request to reduce maximum assessed value to be proportionate to nearby properties. (*Id.*) In *Theda*, the court applied the holding of *Nordlinger v. Hahn*, 505 US 1, 112 S Ct 2326, 120 L Ed 2d 1 (1992)[4] to Oregon's Measure 50, concluding that it did not violate the equal protection clause.

Plaintiff argues *Theda* and similar cases are "clearly wrong" and contrary to *Penn Phillips Lands*. (Reply at 3.) Plaintiff reasons that

> "*Nordlinger* was justified because [Proposition 13] allowed families tax relief to retain their homes until they chose to sell. At that time the buyer was assessed fully. Measure 50 was [the] opposite, it imposed the very highest [maximum assessed values] on the pre 1997-2004 families and the owners of the homes would pay a large tax penalty forever."

---

[4] *Nordlinger* upheld California's Proposition 13 tax limitation against an equal protection challenge. As described in the case, Proposition 13 imposed limitations on property tax rates and annual assessment increases. 505 US at 3-4. Once established, assessed values cannot increase by more than two percent per year unless the property is transferred. *Id.* at 5. The transfer exception is, in turn, subject to exemptions from reassessment, including for homeowners over the age of 55 who sell their principal residence and for transfers of a principal residence between parents and children. *Id.* Over time, Proposition 13 "created dramatic disparities in the taxes paid by persons owning similar pieces of property." *Id.* at 6. For instance, the taxpayer in *Nordlinger* paid "five times more in taxes than some of her neighbors who owned comparable homes * * *." *Id.* at 7.

(*Id.* at 4.) In Plaintiff's view, California's Proposition 13 differs significantly from Measure 50 because assessed value is reset upon sale.

Finally, Plaintiff argues that the subject property's 2020-21 real market value should be reduced to its purchase price of $495,000. (Ptf's Mot at 2; Ptf's Reply at 2 (citing ORS 308.205).) Plaintiff asserts that the sale was voluntary and arm's-length and discusses other factors that may have impacted the sale price, such as a lack of privacy. (*Id.*)

### III. ANALYSIS

The issues presented are 1) whether the subject property's 2020-21 maximum assessed value should be reduced to reflect the ratio of average maximum assessed value to average real market value within the subject's neighborhood in 2020; and 2) whether the subject property's 2020-21 real market value should be reduced to $495,000 based on its sale price.

A.      *Maximum Assessed Value Claim*

The court agrees with Defendant that Plaintiff's claim is indistinguishable from that made in *Theda*. In that case, taxpayers sought to reduce the maximum assessed value and assessed value of their property "so that the relationships of [assessed value] to [real market value] for their property approximates that which they allege exists for similar properties." *Theda,* 20 OTR at 237-38. No statutes supported taxpayers' requested reduction, so they argued that Measure 50 violated the equal protection clause of the Fourteenth Amendment. *Id.* at 238. The court rejected that argument based on the ruling in *Nordlinger*:

> "The mechanisms of Proposition 13 and Measure 50, while not identical, are, in all material respects, similar limitations on the increase in tax base. Both rely, to a greater or lesser extent, on historical values and limited increases to those values. The mechanisms of Proposition 13, like those of Measure 50, can result in what the Supreme Court described as 'dramatic disparities in the taxes paid by persons owning similar pieces of property.'"

*Id.* (quoting *Nordlinger*, 505 US at 6). Other cases from this court have reached similar

conclusions. *See, e.g., Ellis v. Lorati*, 14 OTR 525, 535 (1999); *Kazerouni v. Benton County Assessor*, TC-MD 090644C, 2009 WL 4693835 (Or Tax M Div, Dec 10, 2009) (there is no linkage between real market value and maximum assessed value, so ratios between the two provide no basis to recalculate maximum assessed value).

Notwithstanding the ruling in *Theda*, Plaintiff argues that *Nordlinger* is inapplicable to Measure 50 because California's Proposition 13 resets assessed value upon sale of a property whereas Measure 50 does not. Plaintiff fails to explain how such a mechanism would help here. Plaintiff is not a longtime owner of the subject property, but rather purchased it in 2020. In any event, this court follows the ruling in *Theda*, concluding that Measure 50 does not violate the equal protection clause of the Fourteenth Amendment to the US constitution.

Plaintiff makes several other arguments with respect to maximum assessed value that the court will briefly address. First, Plaintiff claims that the subject property "has never enjoyed the benefits of Measure 50" and "has suffered taxes higher than it would have without Measure 50." (Ptf's Reply at 6-7.) A review of the subject property's tax history reveals those claims to be false. Since 1997, the subject property's assessed value has been based on its maximum assessed value for 14 tax years. Thus, the property taxes imposed on the subject property for those 14 years were less than they would have been without Measure 50. *See Ellis*, 14 OTR at 533 (before Measure 50, property was "assessed at 100 percent of its real market value"). Plaintiff has offered no explanation or support for its allegation that the subject property's taxes have ever been *higher* than they would have been without Measure 50.

Second, Plaintiff claims that a buyer cannot discover a property's tax liability prior to purchase, thus cannot choose to purchase a property with a low maximum assessed value rather than a high maximum assessed value. Assessment and tax rolls are public records. ORS

311.115[5]; *see also Nordlinger*, 505 US at 13 ("A new owner has full information about the scope of future tax liability before acquiring the property, and if he thinks the future tax burden is too demanding, he can decide not to complete the purchase at all."). Plaintiff has obtained property tax records for numerous properties in the EPGC since purchasing the subject property and has offered no explanation why it could not have obtained those records prior to purchasing the subject property as part of its market research.

As alleged by Plaintiff, it appears that the subject property benefits less from Measure 50 than neighboring properties. At least as of 2010, it was relatively unusual for a property in Jackson County to have an assessed value equal to its real market value. The court understands Plaintiff's frustration to learn that it pays higher property taxes than similar and, evidently, superior properties. However, that type of unfairness was anticipated by the drafters of Measure 50 and the voters who approved it. In exchange, property owners received a more stable tax burden, especially during rising markets. Because Measure 50 is not based on a market value standard nor subject to uniformity requirements, Plaintiff's reliance on *Penn Phillips Lands* and *Sioux City Bridge* is unavailing. Each of those cases involved a market value standard for assessment and a failure by the taxing authority to apply that standard in a relatively uniform manner.[6] *See also Nordlinger*, 505 US at 14-15 (distinguishing *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster Cty.*, 488 US 336, 109 S Ct 633, 102 L Ed 2d 688 (1989), which involved a state constitutional requirement that properties be taxed uniformly at market value).

/ / /

---

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

[6] In each case, taxpayer alleged that it had been singled out for correct assessment at 100 percent of market value, whereas all other properties in the relevant area were assessed at a lesser percentage of market value. In *Penn Phillips Lands*, the court found the "only practical relief" was to issue a refund to taxpayer that year. 247 Or at 387.

Plaintiff's request to reduce the subject property's maximum assessed value based on a ratio analysis of neighboring property values finds no support in the law and must be denied.

B.      *Real Market Value Claim*

Plaintiff's second claim concerns real market value, requesting that the subject property's 2020-21 real market value be reduced to $495,000 based on its purchase price. Plaintiff argues this is required under ORS 308.205. That statute defines "real market value" as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). "[A] recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, * * * while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). Real market value "is ultimately a question of fact * * *." *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001). Although Plaintiff's purchase price is certainly relevant evidence of the subject property's real market value, it is not conclusive. The issue of real market value is not appropriate for summary judgment. *See* Tax Court Rule 47 C (summary judgment appropriate when no genuine issues of material fact exist).

If the parties are unable to agree upon the subject property's 2020-21 real market value, Plaintiff may request that the court schedule trial on that issue.

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.  CONCLUSION

Upon careful consideration, the court concludes that Plaintiff's request to reduce the subject property's maximum assessed value based on a ratio analysis of neighboring property values must be denied.  The court further concludes that Plaintiff's request to reduce the subject property's real market value based on its sale price must be denied at this time because real market value is a question of fact inappropriate for summary judgment.  Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that, if Plaintiff wishes to schedule trial on the issue of the subject property's 2020-21 real market value, Plaintiff shall confer with Defendant and propose three mutually agreeable trial dates to the court in writing within 30 days of this Order.

Dated this _____ day of June 2022.


_____
ALLISON R. BOOMER
PRESIDING MAGISTRATE


*This interim order may not be appealed.  Any claim of error in regard to this order should be raised in an appeal of the Magistrate's final written decision when all issues have been resolved.  ORS 305.501.*


*This document was signed by Presiding Magistrate Allison R. Boomer and entered on June 7, 2022.*