IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JOHN EVANS and STACY KOLLAR,     )
          )
       Plaintiffs,       )   TC-MD 200109N
          )
    v.         )
          )
WASHINGTON COUNTY ASSESSOR,    )
          )
       Defendant.      )   **DECISION**

Plaintiffs appealed the value of property identified as Account R490506 (subject property) for the 2019-20 tax year. A trial was held remotely on January 25, 2021. Plaintiffs appeared on their own behalf. John Evans (Evans) testified on behalf of Plaintiffs. Adrienne Wilkes, Appraisal Supervisor, appeared on behalf of Defendant. Kent Cebula (Cebula), registered appraiser, testified on behalf of Defendant. Plaintiffs' Exhibits 1 to 6 and Defendant's Exhibits A and B were received without objection.

Plaintiffs offered Rebuttal Exhibit 7. At trial, Defendant objected to statements made by a realtor on page eight, paragraph two and the court sustained that objection as hearsay and strikes that portion. Defendant also objected to Rebuttal Exhibit 7 as a mixture of factual assertions and closing argument. The court allowed Defendant 30 days to file a written response and closing argument. Defendant's Closing Argument and Objection to Plaintiffs' Rebuttal Exhibit 7 was filed February 23, 2021. Plaintiffs' written closing was filed March 1, 2021. Having considered Defendant's objection, the court construes Plaintiffs' Rebuttal Exhibit 7 as a written closing argument and will disregard any factual content to the extent not already in evidence. This matter is now ready for the court's decision.

/ / /

## I. STATEMENT OF FACTS

The subject property is a one-level townhome constructed in 1972 and located in the Lang Hill subdivision of Tigard. (Ex A at 4.) The subject property has 1,328 square feet of living area with three bedrooms, two full bathrooms, and an attached two-car garage. (*Id*.) It was subject to the Calway Hill Homeowner's Association (HOA) with fees of $405 per month which includes sewer, water, exterior maintenance, landscaping, and access to the clubhouse and pool. (*Id*.; *see also* Ex 1 at 9.) The subject site is 0.06 acres and backs to an open space common area. (Ex A at 4.)

Evans testified that the subject property is located on a "passthrough street" with lots of traffic; there is a large apartment complex nearby, problems with homelessness, including an encampment, and drug and crime issues. (*See also* Ex 1 at 4.) The street is cracked and potholed; there are no sidewalks and there is overgrown landscaping that the HOA is not watering; half the buildings have old, worn paint. (*See also id*. at 5-7.) Evans stated that the HOA clubhouse has two broken saunas and an old, musty smell among other issues. (*Id*. at 7-8.) He acknowledged that this was the state of the neighborhood at the time of their purchase in 2017. Cebula testified that the subject property neighborhood has "average market appeal" and seemed "quiet"; he walked to the park and did not see any encampments. He testified that townhouses in the area range from $205,000 to $550,000, with higher prices for detached homes.

Plaintiffs purchased the subject property in November 2017, for $215,000 as a "fixer" with deferred maintenance and then remodeled it in 2018. (Ex 2 at 2; Ex A at 4.) Cebula testified that he spoke with listing agent for the subject property who agreed it was a "dump" in 2017. Evans testified that they paid $215,000 cash and got a $5,000 credit because his mother-in-law was the realtor.

BOPTA affirmed Defendant's roll values: $319,640 in real market value with $75,430 allocated to exception real market value (exception value) for the remodel, and $233,130 in maximum assessed value. (Compl at 21.) Plaintiffs request a real market value in the range of $275,000 to $288,825, based on their cost and sales comparison approaches and exception value of $75,000. Their concerns are fairness, especially with taxation of similar properties.

A.    *Subject Property Remodel*

Plaintiffs have extensive experience building custom homes professionally in Maryland and they have renovated every home they have lived in. In Maryland, they were part-owners of real estate firm and have 40-years' experience with Potomac Homes Realty. Evans testified Plaintiffs would be very unlikely to sell the subject property for $350,000 or even $315,000.

Plaintiffs' remodeling of the subject property was extensive. (Ex 2 at 2; Ex 3 at 1-3 (describing work done).) Evans testified that they made following improvements:

Plaintiffs replaced the wiring throughout the house and added an electrical panel. They did most of the wiring themselves but used an electrician for the final hook ups. (Ex 3 at 2.) Plaintiffs replaced some drywall and removed a closet in the front entry. (*Id*. at 1.) They removed and replaced the popcorn ceilings in the hallways. (*Id*.) Evans testified that some ceilings were damaged or had collapsed; but he did not "take [the house] down to studs." They replaced pipes throughout home doing the work themselves—Evans testified that the work typically costs $5,000 to $10,000. (*See also id*.) Plaintiffs installed new windows themselves. (*Id*.) They installed new "snap and play" vinyl flooring throughout the house and replaced all the baseboards and trims. (*Id*.) Plaintiffs replaced the fireplace and the ductwork throughout the home. (*Id*. at 1.) They purchased an air conditioning unit. (Ex 2 at 2.)

Plaintiffs remodeled the kitchen. Specifically, Plaintiffs removed a five by six-foot interior, non-load-bearing wall to change the layout from galley to open-concept. They moved the kitchen sink under a window but did not move the plumbing connections. Plaintiffs moved the positions of the oven and the refrigerator. They purchased new granite counters. However, Evans testified that there was lots of chipping and scratching during installation, so they got the counters for free in lieu of a replacement. (*See also* Ex 2 at 2.) Plaintiffs replaced the existing cabinets with prefabricated ones from China. (*See id.*)

Plaintiffs installed a double vanity in the master bathroom and replaced the toilet, tub, and shower. They did not change the layout of the master bathroom. Plaintiffs added a tile wall in the master bathroom—the old materials were laminate. Evans testified that he worked with a tile person. In the guest bathroom, Plaintiffs moved a door.

When asked what in the home was still original, Evans responded a lot of the sheet rock, some ceilings, and the furnace. Evans testified that, even though Plaintiffs did much of the work on the house themselves, it did not add value because "the market will not bear it." He testified that they did this work in lieu of reading books, playing games, and watching TV, none of which has any value.

B.    *Plaintiffs' Cost Approach*

Plaintiffs initially claimed that they spent $56,500 out of pocket (not including labor or installation because they did most of the work themselves) but subsequently revised that figure to approximately $75,000. (*See* Ex 2 at 2.) Plaintiffs equivocated on whether they included their sweat equity in the cost estimates. (*See* Ex 3.[1]) They provided a list with cost estimates which

---

[1] For example, Plaintiffs wrote that working on their home is "what we love doing. I have no idea how much time we spent. We did not log it. It is our enjoyment. It is not work for us. Home values are not based on how much you put into them. They are based upon what a buyer is willing to pay * * *." (Ex 3 at 2.) Yet, some

was based in part on receipts, when available, and in part on educated guesses when receipts were unavailable. (*Id.*) Evans testified that Plaintiffs took advantage of "customer appreciation" and "contractor" discounts from vendors, noting they are available to anyone who asks, though people often do not. (*See id.*) Plaintiffs provided the actual receipts they had. (*Id.* at 5-12.) The receipt for fireplace, piping, and insulation totaled $6,042; Plaintiffs had estimated $5,000. (*Compare* Ex 2 at 2 *with* Ex 3 at 11.) The receipt for cabinetry totaled $5,062; Plaintiffs had estimated $4,500. (*Compare* Ex 2 at 2 *with* Ex 3 at 9-10.) Evans said this was for bathrooms and some cabinets they did not use; did installation themselves. The receipt for the countertops totaled $5,868; Plaintiffs had estimated $2,000. (*Compare* Ex 2 at 2 *with* Ex 3 at 7.) The receipt for the air conditioning unit was $7,198, whereas Plaintiffs had estimated $4,500. (*Compare* Ex 2 at 2 *with* Ex 3 at 6.) The receipt for plumbing hookups totaled $2,350. (*See id.* at 12 (illegible); Ex B at 15 (legible).) Receipt for glass work totaled $3,703. (Ex 3 at 5.) Evans said that was for bathrooms and shower surrounds, including installation.

The total receipts submitted by Plaintiffs showed costs of $30,223, although they conceded that more work was done than they had receipts to prove. Plaintiffs' cost approach based on their estimated "out-of-pocket" costs of $75,000 added to the 2017 sale price of $215,000 indicates a real market value conclusion of $290,000.[2]

C.    *Plaintiffs' Sales Comparison Approach*

Plaintiffs did not produce verified sales, instead relying on tax roll real market values of neighboring properties set by Defendant and sales data and value estimates from Redfin (which they call the "realtor approach"). (*See* Ex 1 at 13-21.) The county assessed real market values

_____

listed costs referenced "work." (*See id.* at 3.)

[2] Plaintiffs previously identified their cost approach conclusion as $275,500, but presumably that was based on an earlier cost estimate that was revised at trial. (*See* Ex 1 at 1.)

for neighboring properties identified by Plaintiffs range in value from $245,300 to $298,640.

(*Id.* at 13-18.) Plaintiffs found that Redfin indicated a range of values for the same properties of $273,965 to $299,837. (*Id.* at 23.) Plaintiffs concluded a real market value of $288,825 based on their comparable sales, discussed in more detail below. (*Id.* at 1.)

Plaintiffs described Comparable 1 as having an "identical mirrored footprint" with a remodel design like the subject property. (Ex 1 at 14.) Evans testified that Plaintiffs based their remodel on this property. (*See also id.*) It is unclear when the property was renovated, but it was before 2017. Evans testified that it was purchased fully renovated in October 2012, for $168,000. (*See also id.* at 23.) Defendant's 2019-20 tax roll real market value for Comparable 1 is $263,060. (Ex 2 at 11.)

Comparable 2 is another similar renovated home nearby with an extra half bathroom. (Ex 1 at 15.) No information was provided on the date it was renovated, but Evans testified that it was before 2017. Redfin showed that it sold in 2016 for $245,000. (*See id.* at 23.) Defendant's 2019-20 tax roll real market value for Comparable 2 is $278,950. (*Id.* at 15.) Evans testified that Comparable 3 is in the same neighborhood as the subject property and is fully renovated with higher-end cabinetry and an extra bathroom. (*See also id.* at 16.) It was purchased in 2016 or 2017 fully renovated. The sale price was not provided. Defendant's 2019-20 tax roll real market value is $298,640. (*Id.*) Comparable 4 has the same footprint as the subject property. (*Id.* at 17.) Evans testified that the bathrooms and floors were redone before purchase and the new owner remodeled the kitchen and other spaces except the dining room after purchase. According to Redfin, it sold for $255,000 in 2018. (*Id.* at 23.) Defendant's 2019-20 tax roll real market value is $255,510. (*Id.* at 17.) Evans testified that, although Comparable 4 was not as nice as the first three properties, it was "very livable" at the time of sale.

Plaintiffs assert that the subject property's HOA fees of $405 per month are above average, meriting a downward adjustment of $38,452.95. (Ex 1 at 9-10.) Plaintiffs provided a printout from Home Smart Realty group showing the average HOA fees in Tigard and King City were $264.27 per month in 2020, which is $160.73 less than the subject property. (*Id.*) Plaintiffs used this figure to extrapolate their proposed adjustment based on a 30-year term. (*Id.*)

D.      *Defendant's Evidence of Value*

Defendant determined the subject property's real market value was $350,000 with an exception value of $95,000 and asks the court to increase the values. (Ex A at 3.) In support of those values it submitted an appraisal report prepared by Cebula.[3] (Ex A.) He visited the subject property on August 1, 2019, to follow up on permits but did not complete an interior inspection at that time. (*See id.* at 82 (permits).) Based on the permits, Cebula assumed that the materials used in the remodel were similar quality and did not change the subject property's layout. When he saw the video of the subject property during this appeal, he learned that the remodel used upgraded materials and changed the layout in the kitchen and bathroom, which increased his opinion of value. (*See* Ex A at 4.)

Cebula variously described the remodel as "above average quality" construction and "good quality" construction. He agreed with most of the work noted by Plaintiffs but observed that Plaintiffs had also added a four-panel sliding glass door in the living room where there had previously been a two-panel door[4], a new deck, new built-in shelving, and interior lighting in the closets. (Ex A at 51-57.) He also noted that a new tub with tile surround and a new vanity with backsplash were added to the guest bathroom. (*Id.* at 55.) Cebula considered this pretty close to

----

[3] Cebula testified that he is a licensed appraiser and holds the position of Appraiser II for Defendant's office, where he's been employed for five years.

[4] *Compare* Ex A at 50 *with* Ex A at 51 (showing sliding door replacement).

a "studs out" remodel.

      1.     *Defendant's evidence regarding the contributory value of the remodel*

Cebula testified that he found no recent sales within one year of January 1, 2019, of remodeled properties in the subject property neighborhood. To determine the contributory value of the remodel, he performed a paired sales analysis of townhomes from other areas and adjusted the prices for time. (Ex A at 6.) Paired Sale 1 compared similar single-story townhomes with two bedrooms and two bathrooms in the same neighborhood. (*Id.* at 7-13.) The remodeled home was similar to the subject property: the kitchen was completely remodeled and open concept; the bathrooms were redone; the floors, trim, windows, and doors were replaced; and a ductless heat pump was installed. (*Id.*) Paired Sale 1 indicated that the contributary value of the remodel was $99,200. (*Id.* at 6.)

Paired Sale 2 is a flipped property located in Tigard, with greater square footage than the subject property but with a remodel of similar scope and quality.[5] (Ex A at 14-21.) The house originally sold for $229,500 in October 2017, and sold after remodel for $345,000 in September 2018, resulting in a difference of $105,000 after adjusting for time. (*Id.* at 6, 14.) Paired Sale 3 is another flipped property, located in Beaverton, that is slightly larger than the subject property and with an extra half bathroom. (*Id.* at 22-29.) Cebula testified that the subject property remodel is generally superior to this one. (*Id.* at 22.) The house sold in "original condition" for $206,000 in July 2019 and again for $293,990 in February 2020, resulting in a difference of $87,990 adjusting for time. (*Id.*)

Paired Sale 4 is two similar homes, both smaller than the subject property, and located

---

[5] The "kitchen was completely remodeled, bathrooms were partially remodeled, baseboard heating was removed and a ductless heat pump was installed, updated electrical, all new windows, flooring, trip & interior doors." (Ex A at 14.)

5.2 miles from the subject property in Beaverton. (Ex A at 30.) Cebula testified that the subject property remodel is superior—the kitchen is still galley-style and the kitchen remodel occurred in the early 2000s. (*Id.* at 30-36.) The un-remodeled house sold in "mostly original condition" for $239,400 in July 2019 and the remodeled house sold for $324,900 in March 2019, resulting in a difference of $91,700 adjusting for time. (*Id.* at 6, 30.) Overall, Cebula found a value range of $87,500 to $105,000 for the remodel with an average of $95,850.[6] (*Id.* at 6.)

Cebula also attempted to prepare a cost approach for the remodel but wrote that it was not accurate given the lack invoices available and information regarding labor costs. (Ex A at 37-38.) He used the invoices provided (totaling $30,223) plus Plaintiffs' estimated costs for the remainder of the work (totaling $40,000) but noted a lengthy list of items for which costs were unknown. (*Id.*) Cebula then looked to the "Cost vs Value Report" in Remodeling Magazine for the Portland, Oregon region in 2019. (*Id.* at 39.) That report showed a value of $83,989 for a two midrange bathroom remodels, a midrange major kitchen remodel and window replacement. (*Id.*) Cebula noted that this estimate did not include any of the improvements made to the flooring, pipes, wiring, doors, or air conditioning. (*Id.*)

2.    *Defendant's cost approach*

Cebula used Marshall and Swift cost factors to conclude to $239,145 for improvements, to which he added $105,000 for land and $5,000 for on-site developments for a total indicated value of $349,145. (Ex A at 78.) He testified that he tried to use actual costs but there was insufficient data available. (*See also id.* at 37.)

3.    *Defendant's sales comparison approach*

Cebula testified that he looked for sales of townhomes that had been remodeled and sold

---

[6] Defendant concluded to a value of $95,850 but is only requesting $95,000. (*See* Ex A at 3.)

within one year of January 1, 2019, but none in the subject property development met the time requirement. (*See also* Ex A at 45.) Sale 1 was located 1.5 miles away in a 55+ development. Because homes there tend to sell for more than the subject area, he adjusted $10,000 for location. (*See id.*) Cebula testified that Sale 1 was the most similar to the subject in scope of remodel. (*See also id.* at 59-60.) He adjusted $5,000 because Sale 1 was an inside unit, which is less desirable than the subject property, an end unit. (*Id.* at 45.) Cebula concluded an adjusted sales price of $351,300 for Sale 1. (*Id.*)

Cebula testified that Sale 2 is located in a superior neighborhood in Beaverton, so he made a downward $30,000 adjustment. (Ex A at 45.) However, he adjusted Sale 2 upward the same amount for its physical condition; the property had some updates, but it was not remodeled to the same extent as the subject property. (*Id.* at 45, 61-65.) Sale 2's adjusted sales price was $343,500. (*Id.*) Cebula testified that Sale 3 was located 1.5 blocks from the subject property and was essentially the same unit but in mostly original condition, albeit well-maintained. (*See also id.* at 67-69.) It may have had new flooring and piping in 2013. Cebula made an upward adjustment of $95,000 for physical condition based on the subject property's remodel resulting in an adjusted sales price of $356,100. (*Id.* at 45.)

Cebula testified that Sale 4 is a townhouse attached to subject property. (*See* Ex A at 46.) He testified that the flooring may have been replaced, however it appeared to have its original patio door, original fireplace and trim. (*See id.* at 70-73.) The kitchen was likely remodeled 15 to 20 years ago based on the dated appliances and Formica countertops. Cebula made an $80,000 upward adjustment for physical condition assuming that the kitchen was remodeled resulting in an adjusted sales price of $335,000. (*See id.* at 46.)

Sale 5 is located 3 miles from subject property in Beaverton. (Ex A at 46.) Cebula

testified that it had new flooring and trim and remodeled bathrooms, but was otherwise original, so he made a $40,000 upward adjustment for physical condition. (*Id.* at 74-77.) He did not make a location adjustment because the area is similar to the subject property neighborhood. After making other small adjustments for size and time, Cebula concluded an adjusted sales price of $360,600 for Sale 5. (*Id*. at 46.) Cebula found a value of range of $335,000 to $360,600 and concluded to a value of $350,000 for the subject property based on the sales comparison approach. (*Id*. 45-46.)

4.     *Reconciliation and response to Plaintiffs' value evidence*

Cebula put all weight on his sales comparison approach. He testified that there was too much deferred maintenance at the time of the subject property sale to use it to determine real market value and that the sale was too distant in time to be reliable. Cebula further testified that, given the state of disrepair of the subject property at the time of sale, it was likely not eligible for financing, which could negatively impact the sales price. He testified that Zillow and Redfin use county data and an algorithm to generate value estimates. (*See* Ex 1 at 23.) Cebula discussed Defendant's process of "annual adjustment" where it determines neighborhood appreciation or depreciation based on all sales from the year, then recalibrates real market value for each year as of the assessment date. He thought Plaintiffs' sales data from 2016 and 2017 was too remote in time to be reliable. With regard to HOA fees, Cebula indicated that they are already "built-in" to the sales price so there is no need for further adjustment.

## II. ANALYSIS

The issues before the court are the subject property's 2019-20 real market value, exception value, and maximum assessed value. The party seeking affirmative relief bears the

burden of proof proving their case by a preponderance of the evidence. ORS 305.427.[7] This means that Plaintiffs bear the burden of proving that the roll values as determined by BOPTA are too high. Because Defendant is requesting an increase in the subject property's real market value and exception value, it bears the burden of proof on those issues. *Rankin v. Multnomah County Assessor*, TC-MD 180080G, 2019 WL 6836008 at *10 (Or Tax M Div, July 22, 2019). "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [the] burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Real market value is defined in ORS 308.205(1), which states:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2019-20 tax year was January 1, 2019. *See* ORS 308.007; 308.210. Real market value is determined by the methods and procedures adopted by the Oregon Department of Revenue. ORS 308.205(2). Three approaches to value must be considered: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a). Even though all three approaches must be considered, all three may not be applicable. The applicable valuation approach is a question of fact that will be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

A.      *Background; Maximum Assessed Value; Exception Value*

Measure 50, passed in 1997, introduced the concept of maximum assessed value, which was originally calculated by taking a property's 1995-96 real market value and subtracting 10 percent.  Or Const, Art XI, § 11(1)(a).[8]  For each successive year, the maximum assessed value may increase by no more than three percent over the prior year.  ORS 308.146(1).  A property's assessed value is the lesser of real market value or maximum assessed value.  *See* ORS 308.146(2).

The three percent limit on maximum assessed value increases is subject to numerous exceptions; relevant here is the exception for "new property or new improvements to property."  ORS 308.146(3)(a).  The real market value of new property or new improvements is known as exception real market value or exception value.   Exception value is added to the maximum assessed value after being multiplied by the "changed property ratio" or CPR which is the average maximum assessed value over the average real market value for the area and class in that assessment year.  ORS 308.153(1)(b).  A reduction in exception value will proportionally reduce maximum assessed value.

B.      *Exception Value*

The real market value of "new property or new improvements" is defined as the excess of the real market value of new improvements over the real market value of any retirements.  ORS 308.153(2)(a).  The real market value of new improvements is their incremental contribution to the real market value of the property as a whole; *i.e.*, it is "the increase in [real market value] of the remodeled property as opposed to the value of the improvements themselves."  *Hoxie v.*

---

[8] Measure 50 amended Oregon's Constitution but was later adopted by the legislature and codified in the ORS.  For ease of reference, the court refers to the statutory provisions.

*Dept. of Rev.*, 15 OTR 322, 326 (2001). Exception value is determine using the same approaches to value discussed above. *Solomon v. Multnomah County Assessor*, TC-MD 140121N, 2015 WL 275815 (Or Tax M Div, Jan 20, 2015).

       1.       *Cost approach to exception value*

"In the cost approach, value is indicated by the current cost of reproducing or replacing the improvements (including indirect costs and entrepreneurial incentive), less depreciation, plus land value." Appraisal Institute, *The Appraisal of Real Estate* 29 (15th ed 2020). The cost approach is useful for appraising new or recently constructed property as well as properties "that are not frequently exchanged in the market." *Id*. at 36. In general, "[t]he real market value of a unit of property may not be determined from the market price of its component parts, such as wood, glass, concrete, furnaces, elevators, etc., each priced separately as an item of property, without regard to its being integrated into the total unit." OAR 150-308-0240(2)(b). "The value estimate must include all costs required to assemble and construct the unit of property." OAR 150-308-0340(2)(f). Because the subject property was newly remodeled, the cost approach might provide a useful value indication. Here, however, Plaintiffs' itemized list of receipts and work is missing relevant and necessary information such as the proof of costs and labor. Additionally, Plaintiffs failed to consider the value of the remodel as a whole, instead relying on separately priced components. For those reasons, Plaintiffs' conclusion of $75,000 is likely understated. Defendant was unable to determine a reliable value under the cost approach due to incomplete information on the remodeling costs. It offered evidence from the Cost to Value report indicating a value of $83,989 for the bathroom and kitchen remodel plus window replacement. That estimate is somewhat more accurate because it reflects the market but is likely understated because it does not include the full scope of the remodel.

2.     *Sales comparison evidence regarding exception value*

Defendant asks the court to increase the exception value from $75,430 to $95,000 based on its paired-sales analysis. The court finds the approach reasonable especially given Defendant's use of similar properties with a similar scope of remodeling work. The subject property remodeling appears to be superior to Paired Sales 3 and 4, each of which had remodeled kitchens that were still galley-style rather than open concept like the subject property. Paired Sale 2 had a similar scope of work, but the master bathroom did not get a shower replacement like the subject. Two of the paired sales provided were of the same property before and after remodel which helps isolate the value attributable to the remodel and tends to confirm that the value differential is attributable solely to the remodel and not to other factors. *See* Appraisal Institute, *The Appraisal of Real Estate* 372-73 (15th ed 2020) (noting that care must be taken with paired data analysis to ensure that value is attributable to selected difference and no other factors). The court agrees that the value attributable to the remodel likely ranges in value from $87,500 to $105,000 and finds that Defendant's exception value conclusion of $95,000 is supported and meets the burden of proof.

C.     *Real Market Value*

As explained above, real market value usually must be determined by reference to the market and in accordance with the three approaches to value. "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Etzger v. Clatsop County Assessor*, TC-MD 120534D, WL

5350257 at *3 (Oct 30, 2012).

       1.     *Plaintiffs' real market value evidence*

      Plaintiffs did not provide an appraisal report from a licensed real estate professional. The court acknowledges that Plaintiffs have substantial experience in the real estate business. As a general matter, owners are permitted to testify regarding the value of their property notwithstanding any lack of qualification. *Freitag v. Dept. of Rev*., 19 OTR 37, 45 n 8 (2006).

      Plaintiffs considered both the cost approach and the sales comparison approach. As discussed above, their cost evidence was incomplete and failed to consider the increase in the value of the remodeled property, focusing instead on the separate components. Plaintiffs also persistently refused to acknowledge the value of labor costs and their "sweat equity" under this approach. For those reasons, the court finds Plaintiffs' cost approach unreliable.

      The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management v. Lane County Assessor*, TC–MD 060354D, WL 1068455 at *3 (Or Tax M Div, Apr 3, 2007) (internal quotation omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, 2003 WL 21263620 at * 3 (Or Tax M Div, Mar 26, 2003).

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, may be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. * * *."

OAR 150-308-0240(2)(c).

      Plaintiffs' sales comparison approach relies on county data on neighboring properties, including values set by Defendant, and on Redfin sales data and estimates. County property tax records and estimates from online data aggregators are not "actual market transactions" as

required by OAR 150-308-0240(2)(c).  The sales provided by Plaintiffs were not verified to ensure that they were arms-length nor were they adjusted for differences.  The court cannot rely on such estimates.  *See Glasser v. Douglas County Assessor*, TC-MD 130188N, 2013 WL 6243710 at *5 (Or Tax M Div, Dec 3, 2013) (holding that property tax records and print outs from Zillow were insufficient to sustain the burden of proof); *see also Freitag v. Dept. of Rev.*, 19 OTR 337 (2007) ("Although mass appraisal is a technique that has a role in the general administration of the property tax laws, once litigation occurs regarding the RMV of any property, the matter is a question of fact to be established in the litigation process.")

To the extent Plaintiffs identified actual sales, important information was lacking.  For instance, it is unclear, based on the sales data and information provided by Plaintiffs, whether the sales reported in Redfin were before or after the remodel work was done.  (*See e.g.* Ex 1 at 15, 23-24 (property was remodeled but unclear whether the work was done before or after the sale in 2016; other properties listed as "unknown" remodel status).)  Some of the sales are distant from the assessment date with no time adjustments.  (*Id*. at 23-24 (sales from 1998, 2012, 2013, and 2016).)  Plaintiffs have not met their burden of proof to reduce the subject property's real market value.  With regard to Plaintiffs' request that the court adjust the subject property's real market value based on the cost of their HOA fees, the court finds that, although Plaintiffs did present some evidence that their fees are above average for the area, they did not present evidence regarding its effect on the value of the subject property.  Cebula credibly testified that the HOA fees are built into the sale prices.  Accordingly, this requested adjustment is denied.

2.      *Defendant's real market value evidence*

Defendant requests that the court increase the subject property's real market value from the $319,640 roll value sustained by BOPTA to $350,000 based on its appraisal report.  As noted

above, Defendant bears the burden of proof by a preponderance of the evidence. Defendant relies on the sales comparison approach to value, in which Defendant considered five comparable sales.

Although sales must be adjusted to be comparable to the subject, the number and magnitude of adjustments is significant when evaluating the reliability of the sales comparison approach. *See Schmidt v. Clackamas County Assessor*, TC-MD 140134C, 2015 WL 782990 at *7 (Or Tax M Div, Feb 24, 2015) (noting that adjustments totaling 36 to 47 percent are of a magnitude that is "troubling to the court"); Appraisal Institute, *The Appraisal of Real Estate* 367 (15th ed 2020) (observing that both the number and magnitude of adjustments is significant when evaluating comparable sales). Sales 3 and 4 were the nearest geographically to the subject property but required large adjustments ($95,000 and $80,000 respectively) based on their condition at the time of sale. Sale 5 – somewhat distant from the subject property – also required a large ($40,000) condition adjustment. Sale 2 required large adjustments for condition and location ($30,000 each). Sale 1, indicating a value of $351,300, appears to be the most similar to the subject property. However, one sale is typically insufficient to support a value conclusion.

Although the court is not persuaded that the subject property's 2019-20 real market value should be increased to $350,000, the court has found that the 2019-20 exception value was $95,000 rather than $75,430, as determined by BOPTA. Because exception value reflects the contributory value of new improvements to real market value, the court's finding supports an increase of $20,430 to the subject property's real market value. Accordingly, the court finds that the subject property's 2019-20 real market value was $340,000. That value is within the range of comparable sales identified by Defendant, albeit at the lower end.

/ / /

D.    *Plaintiffs' Uniformity and Fairness Claims*

Plaintiffs' primary concern is with their tax bill relative to neighboring properties and their sense that Oregon's property tax system lacks uniformity and fairness. As discussed above, Measure 50 established the concept of maximum assessed value. *See* Or Const, Art XI, § 11(1)(a); *Ellis v. Lorati*, 14 OTR 525, 532–33 (1999) (describing the history of the adoption of Measure 50). "Under Measure 50 and the statutes implementing it, there is no linkage between the [real market value] and [maximum assessed value]. Instead, each value is determined and one of the two, the lesser, becomes, in any given year, the assessed value * * * for the property." *Gall v. Dept. of Rev.*, 17 OTR 268, 270 (2003). This court has long acknowledged that "[t]he concept [of maximum assessed value] may, over time, result in various degrees of nonuniformity in the property tax system." *Ellis*, 14 OTR at 535. It is for this reason that Measure 50 "contemplates this and excuses itself from complying with other constitutional provisions requiring uniformity, specifically Article IX, section 1, and Article I, section 32." *Id*.

Plaintiffs are correct that Oregon's property tax system does, at times, result in a lack of uniformity. Unfortunately, the court is not permitted to adjust Plaintiffs' maximum assessed value to achieve equity, fairness, or uniformity with respect to similar properties.

## III. CONCLUSION

After careful consideration, the court concludes that Plaintiffs have not met their burden of proof to reduce the subject property's real market value and exception value. The court finds no basis to reduce the subject property's 2019-20 maximum assessed value. The court concludes that Defendant has met its burden to increase the subject property's 2019-20 real market value to $340,000 with exception value of $95,000 attributable to the remodel. The maximum assessed value shall be adjusted accordingly. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

IT IS FURTHER DECIDED that the subject property's 2019-20 real market value was $340,000 with $95,000 in exception value. Defendant shall adjust the maximum assessed value accordingly.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*Some appeal deadlines were extended in response to the Covid-19 emergency. Additional information is available at https://www.courts.oregon.gov/courts/tax*

*This document was signed by Presiding Magistrate Allison R. Boomer and entered on September 17, 2021.*